## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CITY OF PROVIDENCE, RHODE ISLAND,
Individually and on Behalf of All Others
Similarly Situated

                        Plaintiff,

v.

CENTRAIS ELÉTRICAS BRASILEIRAS SA -
ELETROBRAS, JOSE COSTA CARVALHO
NETO, ARMANDO CASADO DE ARAÚJO,
and JOSÉ ANTONIO MUNIZ LOPES,

                    Defendants

Case No.: 15-cv-6434

**COMPLAINT FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

The City of Providence, Rhode Island ("City of Providence" or "Plaintiff"), by and through its undersigned counsel, on behalf of itself and all others similarly situated, alleges the following based upon the investigation by Plaintiff's counsel, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. The investigation by counsel included, among other things, a review of Centrais Elétricas Brasileiras SA ("Eletrobras" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases issued by the Company, public conference calls, media, analyst and news reports about the Company, and other publicly available information concerning Eletrobras, including trading data relating to the price and volume of Eletrobras American Depositary Shares ("ADSs"), and concerning the Individual Defendants as defined below.

## I.  OVERVIEW OF THE CLAIMS

1.      This is a securities class action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a); and SEC Rules 10b-5, 17 C.F.R. § 240.10b-5 (the "Action").

2.      The Action is brought on behalf of a class consisting of all persons who purchased the publicly traded securities of Eletrobras, including ADSs that trade on the NYSE ("NYSE"), between August 17, 2010 and June 24, 2015, inclusive (the "Class Period") against Eletrobras and certain of its present and former officers and executives for violations of the Exchange Act.

## II.  JURISDICTION AND VENUE

3.      This court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. §§ 1331, 1337, and 1367.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b) and (c). Substantial acts in furtherance of the wrongs

alleged and/or their effects have occurred within this District and Eletrobras' ADSs trade within this district on the NYSE.

## III.    NATURE OF THE ACTION

### A.    Overview

1.    Eletrobras is an energy corporation headquartered in Rio de Janeiro, Brazil and the dominant utility company in Brazil.  Eletrobras operates through three segments: generation, transmission and distribution of electricity.  Eletrobras generates about 35% of Brazil's total electricity generation capacity and its transmission networks comprise approximately 55% of the country's total transmission network.  The Company generates electricity through the operation of hydroelectric plants, thermoelectric plants, wind farms and thermonuclear plants.   Eletrobras transmits electricity across 61,534 km of transmission lines throughout Brazil.

2.    Eletrobras primarily conducts its business through its operating subsidiaries, including Eletrobras Eletronorte, Eletrobras CGTEE, Eletrobras Eletronuclear, Eletrobras Chesf, Eletrobras Furnas, Eletrobras Eletrosul, Eletrobras Distribuição Alagoas, Eletrobras Distribuição Acre, Amazonas Energia, Eletrobras Distribuição Piauí, Eletrobras Distribuição Rondônia and Eletrobras Distribuição Roraima.  The Company also invests in special purpose companies for the development of certain projects.

3.    The Brazilian government is the controlling shareholder of Eletrobras.  As of December 31, 2013, the Brazilian government held 54.5% of Eletrobras' voting shares.  The Brazilian government, among other things, has the right to appoint seven out of the 10 members of Eletrobras' Conselho de Administração (the "Board of Directors") and, through them, a majority of the executive officers responsible for the Company's management, including its Chief Executive Officer.

4.      This action arises from a massive bribery and corruption scheme at Eletrobras that reaches the highest levels at the Company as well as within the Brazilian government.  The scheme involves bribery and kickbacks on multi-billion dollar construction projects controlled by Eletrobras and its subsidiaries.  Eletrobras' participation in this bribery and money laundering conspiracy lined the pockets of both high ranking senior executives of the Company and its subsidiaries, as well as political parties aligned with the Brazilian President.  Unbeknownst to Plaintiff, the Company was engaged in an illegal scheme whereby billions of dollars paid by the Company to third parties, ostensibly for construction and services contracts, were being diverted to Eletrobras' executives and to political parties associated with the Company's management.  In particular, the Company and its executives awarded contracts to a cartel of engineering and construction companies in exchange for bribes and political kickbacks to the Partido dos Trabalhadores (the "PT Party" or "Worker's Party") on at least the following three projects:  (1) the Angra 3 thermonuclear reactor ("Angra 3"), (2) the Belo Monte hydroelectric dam ("Belo Monte"), and (3) the Jirau hydroelectric dam ("Jirau").

5.      The massive corruption scheme within Elebrobras was in direct contradiction to Eletrobras' "Code of Ethics, Ethical Principles and Conduct Commitments" (the "Code of Ethics"), publicly available and incorporated by reference into the Company's filings with the SEC.

6.      Pursuant to the Code of Ethics, Eletrobras specifically assured its investors of its commitment to "[m]aking corporate decisions based on the principles of ethics, transparency, integrity, loyalty, impartiality, legality and efficiency and to use their economic-financial resources with responsibility in order to attain higher levels of competitiveness, excellence and profitability, taking into account the legitimate interest of all stakeholders."  Further, the Code of Ethics assured

investors that Eletrobras was committed to "[r]efusing and denouncing, any form or attempt of corruption, bribery, kickback and 'back-scratching'" and "[g]iving no support or contributions to political parties or political campaigns for elected offices."   Despite these assurances, throughout the Class Period, Electrobras was in direct violation of the Code of Ethics it publicly espoused.

7.    In the course of a Brazilian criminal money laundering investigation dubbed operation "Lavo Jato," or "Operation Car Wash," that became public in March 2014, Brazilian prosecutors discovered that for years a group of as many as 16 construction companies had driven up the costs of contracts and then paid bribes to executives and politicians in exchange for the award of the overvalued contracts.  The Brazilian Federal Police, through wiretaps of a suspect in an illegal black market money laundering syndicate, learned of a multi-billion dollar money laundering and bribery scheme at state-run oil company Petróleo Brasileiro S.A.'s ("Petrobras").  Although much of the investigation by the Brazilian prosecutors initially focused on Petrobras, in early 2015 the scope of the investigation broadened to encompass Eletrobras as significant facts surfaced implicating Eletrobras in an equally massive corruption scheme bearing a striking resemblance to the one at Petrobras.

8.    Dalton Avancini ("Avancini"), the CEO of Brazil's largest construction company, Camargo Corrêa SA ("Camargo Corrêa"), who is among those arrested and himself accused of paying bribes to obtain contracts, reportedly substantiated Eletrobras' involvement in the widespread bribery in March 2015 during two weeks of testimony in the Brazilian criminal probe.  Avancini is said to have told prosecutors that Camargo Corrêa paid kickbacks after winning contracts for the Belo Monte dam project (including funneling money to political officials), and that a similar cartel of builders was also formed by builders with Angra 3 contracts.  Other witnesses -  Alberto Youssef (a money launderer) and Roberto Costa (a former executive of

Petrobras) - have also testified that a number of Eletrobras' subsidiaries and other companies controlled by Eletrobras made illegal payments to the cartel of construction companies awarded contracts for Eletrobras projects.

9.      Operation Car Wash has led to the arrests of more than 100 individuals in Brazil, many of whom are executives of the construction companies involved in the massive corruption scheme.  Recently, on July 28, 2015, Othon Luiz Pinheiro da Silva ("Pinheiro da Silva"), the CEO of Eletrobras Thermonuclear S.A. - Eletronuclear ("Eletronuclear" or "Eletrobras Eletronuclear"), was arrested.   Eletronuclear is a wholly-owned subsidiary of Eletrobras responsible for the construction of the Angra 3 thermonuclear reactor.   Prosecutors say Pinheiro da Silva took more than $1.2 million U.S. dollars in bribes as CEO of Eletronuclear in exchange for awarding contracts for Angra 3 to at least two construction companies.

10.      Throughout the Class Period investors and analysts questioned the rising costs of Eletrobras' largest construction projects and sought to understand the potential return on investment given the increased costs, particularly with respect to Angra 3 and Belo Monte.  In response, Eletrobras and the Individual Defendants (as defined below) repeatedly side-stepped the questions and made representations that the Company was awarding contracts pursuant to a competitive bidding process and related negotiations, as well as the potential return on investment approved by the Board of Directors.  In reality, the awards were the product of undisclosed bribery and kickbacks.   Eletrobras continues to deny knowledge of a corruption scheme within the Company; however, the Company has created three internal commissions to investigate the procurement processes at Angra 3, Belo Monte and Jirau, and has also hired outside counsel to conduct independent investigations into these matters.  The Company also denies that its former and current auditors are refusing to sign off on its financial statements absent provisions related to

the corruption.  Nonetheless, Eletrobras has thus far failed to file its 2014 annual report on Form 20-F, having missed both the initial April 30, 2015 prescription date and the extended deadline of May 15, 2015.

11.    Executives at the highest level of Eletrobras awarded contracts throughout the Class Period to a cartel of construction companies based on bribes and kickbacks funneled to company executives and political parties.  This materially inflated the costs of construction projects. Although the details of how Eletrobras accounted for or failed to account for the improper bribes and kickbacks are not yet fully understood, it is clear that the Company did not transparently account for these improper payments.  It appears that, like Petrobras, in order to hide the nature and extent of these improper payments Eletrobras improperly capitalized the payments as costs related to the construction and completion of its utility projects, recording them as part of the value of the Company's assets on its balance sheet.  Accordingly, Eletrobras' publicly released financial statements, including the value of its assets and its net income, were false and misleading throughout the Class Period.  Further, instead of operating transparently and denouncing any form of bribery and corruption as represented in its Code of Ethics, Eletrobras was embroiled in a massive corruption scheme benefiting its top executives and political parties at the expense of the Company's shareholders and investors.

**B.     Capital Projects Used to Divert Funds to the Scheme**

12.    During the Class Period, while knowingly using Eletrobras' major projects as the source for funding the bribery and corruption scheme, Eletrobras repeatedly assured investors that the cost overruns were just part of normal operating procedures and that the contracts were fairly negotiated with the contractors.  Below are the three projects preliminarily under investigation by Brazilian Prosecutors and the Company itself.

### 1.      Angra 3 Thermonuclear Reactor

13.      The Angra 3 thermonuclear reactor is being constructed as part of a larger complex known as the Angra Nuclear Power Plant.  The Angra Nuclear Power Plant is Brazil's sole nuclear power plant, and is operated by Eletrobras' subsidiary Eletronuclear.  It is located on the Itaorna Beach in Angra dos Reis, Rio de Janeiro, Brazil.  The plant currently consists of two pressurized water reactors, Angra 1, with a net output of 637 megawatts, first connected to the power grid in 1985 and Angra 2, with a net output of 1,350 megawatts connected in 2000. Work on the third reactor, Angra 3, projected to output 1,405 megawatts, began in 1984 but was halted in 1986. Construction started again on June 1, 2010 for entry into service in 2015, but completion of Angra 3 has been delayed until 2018.  The estimated total cost of completion of Angra 3 is about $5.6 billion.

14.      In mid-February 2014, Eletrobras awarded contracts worth approximately $1.5 billion U.S. dollars for the largest remaining work on Angra 3 to two consortiums of construction companies.  Andrade Gutierrez, the leader of one of the consortiums, was among the companies awarded work under the contracts.  Pinheiro da Silva, who was arrested on July 28, 2015, is alleged by prosecutors to have taken bribes from at least two construction companies, one of which is Andrade Gutierrez, in exchange for awarding the contracts.  Along with Pinheiro da Silva, Flavio Barra, the head of Andrade Gutierrez's engineering unit was also arrested on July 28, 2015.

### 2.      Belo Monte Hydroelectric Dam

15.      The Belo Monte hydroelectric dam is a hydroelectric dam complex under construction on the Xingu River, a major tributary of the Amazon.  Belo Monte will be the third largest hydroelectric dam in the world upon its completion with a planned installed capacity of 11,233 megawatts.   Since the Belo Monte dam is designed to divert about eighty percent of the

Xingu River flow, which could devastate a large portion of Brazilian rainforest, it has been highly controversial.

16.     Plans for the dam began in 1975 but were shelved due to the environmental controversy.  Pursuant to a redesign of the project, in August 2010, Norte Energia S.A (a special purpose entity set up by Eletrobras) was awarded the contract to construct Belo Monte.  Norte Energia is controlled by Eletrobras which owns a nearly 50% stake through its direct ownership and ownership interests held by two Eletrobras subsidiaries (Eletrobras EletroNorte and Eletrobras Chesf).  Construction of Belo Monte started in 2011 and is planned for completion by 2019.  The current estimated total cost of completion of the Belo Monte complex is about $18.5 billion.

17.     Testimony given in March 2015 in connection with the Brazilian criminal investigation has revealed that bribes and kickbacks were paid by construction companies with monies from the Belo Monte contracts.  Specifically, the CEO of Camargo Corrêa, one of the lead companies in the cartel of construction companies identified by Brazilian prosecutors, has said that Belo Monte contracts were tied to improper payments.  In June 2015, the Tribunal de Contas da União (the "TCU"), the Brazilian equivalent of the U.S. Government Accountability Office and tasked with auditing procurement and contracting practices at companies partially- or wholly-financed by the Brazilian government), began a probe into the Belo Monte project.

### 3.     Jirau Hydroelectric Dam

18.     The Jirau hydroelectric dam is part of a four power plant hydroelectric complex under construction in the Madeira River in the western Amazon region of Brazil.  Given its location in the Amazon and potential environmental impacts, it has also been subject to criticism similar to Belo Monte.  Eletrobras established a special purpose entity, Energia Sustentável do Brasil SA, for the construction of Jirau and Jirau is operated by Eletrobras Eletrosul and Eletrobras Chesf.

Construction on Jirau began in 2008.  Jirau, which was planned to be completed in 2015, is only partially operational and has cost approximately $8 billion.

19.     Eletrobras, which has missed two deadlines for filing its 2014 Form 20-F (April 30, 2015 and May 15, 2015) has attributed its delay in filing its 20-F, at least in part, to the fact that the auditor of Energia Sustentável do Brasil SA resigned because it did not consider itself independent under the relevant U.S. independence rules for the purposes of applying equity method accounting to Eletrobras' consolidated financial statements.

## IV.     THE PARTIES

### A.     Plaintiff

20.     The City of Providence is a municipal corporation with its principal address at Providence City Hall, 25 Dorrance Street, Providence, Rhode Island 02903.  The City of Providence manages hundreds of millions of dollars in assets on behalf of thousands of beneficiaries associated with the City of Providence, including active and retired public employees and their dependents. As set forth in the attached certification, the City of Providence purchased Eletrobras securities during the Class Period and was damaged thereby.

### B.     Defendants

21.     Defendant Eletrobras is a semi-public corporation organized under the laws of Brazil, and maintains its principal executive offices at Avenida Presidente Vargas, 409, 13 Floor, Edificio Herm. Stolz, CEP 20071-003, Rio de Janeiro, Brazil.   Eletrobras is Brazil's dominant electric company.

22.     Eletrobras was established in 1962 during the presidency of João Goulart.  As of December 31, 2013, according to the Company's annual filing, the Brazilian government owned 54.5% of the Company's common shares, which are its voting shares.   Since at least 2002,

Eletrobras has sponsored ADSs representing the Company's common and preferred equity that are listed on the NYSE, trading under the ticker symbols "EBR" and "EBR/B," respectively.

23.     Defendant José Antonio Muniz Lopes ("Lopes") was the CEO of Eletrobras, a member of the Executive Board and a member of Eletrobras' Board of Directors from the start of the Class Period up through February 25, 2011.   Lopes signed the Eletrobras Code of Ethics adopted in 2010 that was operative throughout the Class Period.

24.     Defendant José da Costa Carvalho Neto ("Carvalho Neto") replaced Lopes and was appointed as the CEO, a member of the Executive Board and a member of Eletrobras' Board of Directors on February 25, 2011 and continues to hold these positions.  Carvalho Neto signed Eletrobras' annual reports on Form 20-F filed with the SEC on July 1, 2011 for the year ended December 31, 2009 (the "2009 20-F"), on October 17, 2011 for the year ended December 31, 2010 (the "2010 20-F"), on May 22, 2012 for the year ended December 31, 2011 (the "2011 20-F"), on May 1, 2013 for the year ended December 31, 2012 (the "2012 20-F") and on April 30, 2014 for the year ended December 31, 2013 (the "2013 20-F").  He also signed Sarbanes Oxley ("SOX") certifications included in each of the Form 20-Fs.

25.     Defendant Armando Casado de Araújo ("Araújo") served as the Chief Financial Officer of Eletrobras throughout the Class Period.  Araújo signed, among other things, Eletrobras' 2009 20-F, 2010 20-F, 2011 20-F, 2012 20-F, and 2013 20-F, as well as a SOX certification included in each Form 20-F for those years.

26.     Carvalho Neto, Araújo, and Lopes are collectively referred to as the "Individual Defendants."

## V.    CLASS ACTION ALLEGATIONS

27.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons and entities who purchased Eletrobras' publicly traded securities during the Class Period (the "Class").

28.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at the present time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members of the Class located throughout the United States.  As of December 31, 2013, Eletrobras had 20,586 beneficial and 15 registered holders of ADSs representing common shares and 7,492 beneficial and eight registered holders of ADSs representing preferred shares.

29.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class have sustained damages because of defendants' unlawful activities alleged herein.  Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously.  The interests of the Class will be fairly and adequately protected by plaintiff.  Plaintiff has no interests which are contrary to or in conflict with those of the Class that plaintiff seeks to represent.

30.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

31.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)      whether defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)      whether defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)      whether the members of the Class have sustained damages and the proper measure of such damages.

## VI.      FALSE AND MISLEADING STATEMENTS

32.      On August 17, 2010, Eletrobras reported its second quarter 2010 financial results, including net income of R$995.4 million.  The Company held a conference call to discuss the second quarter results during which an analyst asked if the Company intended to disseminate the contract details for Belo Monte, "especially regarding CapEx and levering financing conditions." In response defendant Araújo stated as follows:

> Yes.  We are finishing the negotiations.  Our engineering director is working full time on this topic, closing and signing contracts. . . .We have already some signals about how the funding is going to be and we have to close this, perhaps this coming year, we will be able to provide this information.

33.      On November 26, 2010, Eletrobras filed a Form 6-K (the November 26, 2010 Form 6-K") with the SEC regarding "the article published today in the newspaper Valor Economico, entitled 'Minority shareholders want more data of the Eletrobras controlled companies.'"  The November 26, 2010 Form 6-K was signed by Defendant Araújo.  In response to the article, Eletrobras stated, among other things, in the November 26, 2010 Form 6-K as follows regarding the Belo Monte and Angra 3 construction projects:

In the case of Belo Monte Project, and Angra 3, mentioned in the article, the guidelines, including minimum profitability, were fully approved by the Board of Directors.  As the funding and contracts with suppliers are being negotiated by the company, it is not possible yet to determine the final profitability of the two projects.

34.    On July 1, 2011, the Company filed its 2009 20-F with the SEC and reported its 2009 financial results.  Eletrobras reported total property, plant & equipment ("PP&E") of R$74.435 billion and a net loss of R$1.633 billion.  The 2009 20-F was signed by Defendants Carvalho Neto and Araújo.

35.    The 2009 20-F also includes SOX certifications of Defendants Carvalho Neto and Araújo, which state, in part, the following:

1. I have reviewed this annual report on Form 20-F of CENTRAIS ELÉTRICAS BRASILEIRAS S.A. – ELETROBRAS (the "company")

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements and other financial information included in this report fairly present in all material respects the financial condition, results of operations and cash flows of the company as of and for the periods presented in this report;

4. The company's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

a) Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the

preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5. The company's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and to the audit committee of the company's board of directors (or persons performing the equivalent function):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

36.    The 2009 20-F also refers to Eletrobras' Code of Ethics on the Company website and states "[w]e have adopted a code of ethics that applies to all our employees, including our chief executive officer, chief financial officer, principal accounting officer and persons performing similar functions, as well as directors and other officers."   In pertinent part, the Code of Ethics referenced in the 2009 20-F states

The Single Code of Ethics for the Eletrobras Companies, presented herein, is another expression of the importance of the ethical dimension in our corporate decisions and practices.   Covering all of the Eletrobras Companies, the Code reflects the new reality of our Companies, not only in its results, but also in the way in which it was created.

* * *

## II. INTEGRITY

Complying with commitments undertaken to honesty and probity, in which discourse and actions are coherent, and repudiating any manner of fraud and corruption by maintaining an active stand under situations which are not in compliance with ethical principles.    * * *

## IV. TRANSPARENCY
Ensuring visibility of criteria, which charter the decisions made and actions taken by Eletrobras Companies by communicating in a clear, accurate, agile and accessible manner, taking into account the limits of the rights of confidentiality.

* * *

## V.  IMPARTIALITY
Establishing that public interests must be above personal ones in order to ensure objectivity and impartiality in decisions, actions and in the use of resources from Eletrobras Companies.

## VI. LEGALITY
Complying with Brazilian laws and with the legislation of countries in which Eletrobras Companies operate, as well as with internal norms which regulate the activities of each company, in accordance with Brazilian constitutional principles and international treaties entered by Brazil.

* * *

## CONDUCT COMMITMENTS

### 1. Commitments of Eletrobras Companies Related to Corporate Governance

* * *

1.3  Basing their relationship with stakeholders on proactive communication that is accurate, proper, transparent and timely, making all information promptly available in order to deflate rumor and speculation.

* * *

1.9  Refusing and denouncing any form or attempt of corruption, bribery, kickback and "back-scratching".

1.10   Giving no support or contributions to political parties or political campaigns for elected offices.

37.    On October 17, 2011, the Company filed its 2010 20-F and reported its 2010 financial results.  In particular, Eletrobras reported total PP&E of R$46.682 billion and net income

of R$2.553 billion.[1]  The 2010 20-F was signed by Defendants Carvalho Neto and Araújo and included SOX certifications of Carvalho Neto and Araújo substantially the same as above in paragraph 35.  The 2010 20-F again referenced the Company's adoption of the Code of Ethics posted on the Company website.

38.     On November 8, 2011, Eletrobras filed a Form 6-K (the "November 8, 2011 Form 6-K") with the SEC "in relation to the matter published in the newspaper Valor Economico, of November 4, 2011, under the title 'Minority representative wants information about Belo Monte and Angra 3.'"  In the November 8, 2011 Form 6-K, Eletrobras stated, among other things that "we hereby clarify our Shareholders and the Market in General that the administration of Eletrobras adopts full transparency on all company investments and acts of governance, analyzing them from the point of view of business, risk and return."  The November 8, 2011 Form 6-K was signed by defendant Araújo.

39.     On May 22, 2012, the Company filed its 2011 20-F and reported its 2011 financial results.  In particular, Eletrobras reported total PP&E of R$53.215 billion and net income of R$3.762 billion.  The 2011 20-F was signed by Defendants Carvalho Neto and Araújo and included SOX certifications of Carvalho Neto and Araújo substantially the same as above in paragraph 35. The 2011 20-F again referenced the Company's adoption of the Code of Ethics posted on the Company website.

40.     On May 1, 2013, the Company filed its 2012 20-F and reported its 2012 financial results.  Eletrobras reported total PP&E of R$47.407 billion and a net loss of R$6.926 billion.  The

---

[1]     In the Company's 2010 20-F, Eletrobras stated that "[t]he financial statements of the Company for the year ended December 31, 2010 are the first annual consolidated Financial Statements in compliance with the IFRSs [International Financial Reporting Standards]."  The prior 20-F was represented to have been prepared in accordance with U.S. Generally Accepted Accounting Principles ("GAAP"), which may differ from IFRSs.

2012 20-F was signed by defendants Carvalho Neto and Araújo and included SOX certifications of Carvalho Neto and Araújo substantially the same as above in paragraph 35.  The 2012 20-F again referenced the Company's adoption of the Code of Ethics posted on the Company website.

41.     On May 17, 2013, during a conference call to discuss the Company's first quarter 2013 financial results, in response to an analyst who asked about the news in the press regarding Belo Monte and its higher budget and what the expected return would be, Defendant Araújo rambled a bit and then ultimately stated as follows:

> And now, we have the problem of the group of assets that is going to be operated and kept. And we are going to earn through this asset. So we have to be very responsible in the execution of our project because now we have to be sure of the profitability of the business. We have worked with this premise already. . . .I cannot answer the question, by the way, but we think that we are not in -- taking on any additional costs.
>
> * * *
>
> We are not going to take on any additional costs without analyzing things that - through a process of negotiation, there is within the provision of the structuring project of this nature.

42.     On or about February 12, 2014, Eletrobras reportedly issued a statement that it had awarded contracts worth approximately $1.5 billion U.S. dollars for Angra 3 primary and secondary systems.  The Company's statement was reported as follows in the news:

> The company said in a statement the contracts, awarded to two consortiums of construction and engineering companies, were the largest remaining to be awarded as part of the part of the project to complete the unfinished unit in the state of Rio de Janeiro.
>
> The work was divided into two separate contracts, one for electro-mechanical assembly associated with the reactor's primary system and another for the secondary-side work.
>
> A group comprising conglomerate Queiroz Galvao and the companies EBE and Techint was awarded the primary loop work while a consortium of Brazilian companies led by construction company Andrade Guitierrez was awarded the secondary-side contract, Eletrobras Eletronuclear said.

43.     On April 30, 2014, the Company filed its 2013 20-F and reported its 2013 financial results.  Eletrobras reported total PP&E for 2013 of R$30.038 billion.  Eletrobras also reported a net loss of R$6.291 billion for 2013.  Due to the retrospective adoption of IFRS 11 for the accounting of joint ventures and joint operations using equity method accounting rather than proportional consolidation accounting, which the Company stated is no longer allowed, Eletrobras restated its total PP&E for 2012 as R$29,494 billion in the 2013 20-F.  The 2013 20-F was signed by Defendants Carvalho Neto and Araújo and included SOX certifications of Carvalho Neto and Araújo substantially the same as those above in paragraph 35.  The 2013 20-F again referenced the Company's adoption of the Code of Ethics posted on the Company website.

44.     Additionally, in the 2013 20-F, Eletrobras disclosed that its independent auditor PricewaterhouseCoopers Auditores Independentes ("PwC") would be replaced by KPMG Auditores Independentes ("KPMG") on a prospective basis, stating that the change in auditors was being made pursuant to a regulation of the CVM that limits the consecutive terms that certain service providers can serve.

45.     The statements referenced in ¶¶ 32 - 44 were materially false and/or misleading because Defendants held themselves out as refusing any form of corruption, bribery or kickback and making decisions transparently based on ethical principles, but failed to disclose, among other things, that (1) the Company and Individual Defendants were engaged in a massive bribery and corruption scheme operating in direct contradiction to the publicly-available policies set forth in the Company's Code of Ethics and other corporate governance directives, (2) there were serious irregularities with respect to the costs of contracts that Eletrobras entered into for the construction of projects, including Angra 3, Belo Monte and Jirau, (3) a substantial amount of the contracts the Company awarded were the product of bid-rigging that materially inflated the costs of contracts,

(4) the Company's financial statements were materially false and misleading and not presented in accordance with International Financial Reporting Standards, and (5) the Company had material deficiencies in its internal controls over its financial reporting.

## VII.   THE TRUTH BEGINS TO EMERGE

46.     On February 10, 2015 before the market opened for trading, Eletrobras disclosed in a Form 6-K filing with the SEC (the "February 10, 2015 Form 6-K") the translation of an article in the Brazilian magazine Veja alleging that after PwC refused to sign Eletrobras' financial statements without provisions related to corruption measures, Eletrobras brought in KPMG as its independent auditor.  Specifically, the February 10, 2015 Form 6-K signed by Defendant Araújo states as follows:

> In response to Oficio CVM/SEP/GEA-1/N° 032/2015, transcribed below, we hereby informe [sic] our shareholders and the market in general that Eletrobras, until this date, was not informed by the independent auditors KPMG ("KPMG") about any fact regard the subject fraud and corruption that may have effect or result in delays of the filing and disclosure of its financial statements for the year ended December 31, 2014, as well as the Company, through its internal controls and compliance program, did not identify the existence of any episode of fraud and corruption in its projects.
>
> KPMG has been performing normally in the Company's accounting audit procedures in accordance with Brazilian and international auditing standards, including those set out in NBC TA 240 approved by the Brazilian Federal Accounting Council. For this reason Eletrobras clarifies that the information disclosed by the magazine Veja does not correspond to the reality of the work being done at this time, to completion of the Financial Statements for the year 2014, whose date for disclosure to the market remains scheduled for March 27, 2015.  The Company is available, through its investor relations area, to provide any clarification regarding this announcement.
>
> OFÍCIO/CVM/SEP/GEA-1/N.° 032/2015
>
> Subject: **Clarification request**
>
> Dear CFO,

We refer to the article published on 02.08.2015 in the magazine VEJA, entitled "Corruption Balance", whose contents are transcribed below:

After the PwC had refused to sign the Petrobras financial statements without the provisions related to corruption measures in the Brazilian State Company, now it's KMPG time. The audit company requires that Eletrobras and others electric energy state companies make the provisions in its financial statements regarding the corruption.

About that, we request clarification about the veracity of these claims and, if confirmed, clarify the reasons why the company understood not to disclosure Relevant Fact according to CVM Instruction No. 358/2002.

Furthermore, considering the truth on the news, we request the Company manifestation of internal measures adopted, or to be adopted on the subject.

This clarification shall be sent through the IPE System, at the Market Announcement category, type Clarifications Consultations CVM / BOVESPA, Disclosed News on Media, which shall include the transcription of this letter.

Rio de Janeiro, February 10, 2015.

47.     On February 10, 2015, despite Eletrobras' representations in the Form 6-K that there was no truth to the allegations in the Veja article, Eletrobras' ADSs declined by nearly 7% on heavy trading volume to close at $1.74 per ADS on February 10, 2015.

48.     During the first two weeks in March 2015, witnesses in the Car Wash Operation gave testimony to Brazilian prosecutors with specifics of how bribes and kickbacks to political parties were paid out of funds for some of Brazil's largest construction projects.  Although the unprecedented corruption scandal in Brazil had centered on oil company Petrobras for over a year since the first arrests of Petrobras executives in March 2014, revelations that Eletrobras was a key player in the intricate scheme of bid rigging, bribery and kickbacks emerged during the testimony. Avancini, the CEO of Brazil's largest construction company, Camargo Corrêa, who was arrested in November 2014 and accused of paying bribes to obtain contracts, reportedly substantiated Eletrobras' involvement in the widespread bribery.  In particular, Avancini is said to have told

prosecutors that Camargo Corrêa paid kickbacks after winning contracts for the Belo Monte dam project (including funneling money to political officials), and that a similar cartel of builders was also formed by builders with Angra 3 contracts.  Other witnesses, Alberto Youssef (a money launderer) and Roberto Costa (a former executive of Petrobras), also gave testimony that a number of Eletrobras' subsidiaries and other companies controlled by Eletrobras had made illegal payments to the cartel of construction companies awarded contracts for Eletrobras projects.  On or about March 2, 2015 when news began circulating that Avancini planned to tell prosecutors about bribery at Belo Monte, Eletrobras' ADSs declined by more than 6% and continued to decline for two weeks as information regarding witness testimony in Operation Car Wash emerged.  In total, from March 2, 2015 through March 12, 2015 as the witnesses testified in the criminal investigations, Eletrobras' ADSs declined every trading day and lost over 21% of their value, closing at $1.54 per ADS on March 12, 2015.

49.  On March 27, 2015, Eletrobras filed its 2014 annual financial statements with the Brazilian Securities Commission (the Comissão de Valores Mobiliários, or "CVM") and disclosed that in relation to media reports regarding companies which provide services to two specific purpose entities in which Eletrobras has interests, Norte Energia S.A. responsible for Belo Monte and Energia Sustentável do Brasil SA responsible for Jirau, as well as Eletrobras' wholly owned subsidiary Eletronuclear responsible for Angra 3, the Company had created three Inspection Committees.  The Inspection Committees created in March 2015 would conduct additional verification procedures in relation to the procurement procedures used in connection with Belo Monte, Jirau and Angra 3.  On March 27, 2015, Eletrobras' ADSs declined by 4.5% to close at $1.70 per ADS on March 27, 2015.

21

50.     On April 27, 2015, despite news reports circulating in Brazil that the award of contracts in connection with the construction of Angra 3 was tied to bribery and corruption, Eletrobras' wholly owned subsidiary Eletronuclear reportedly issued a statement that the bidding process was fair.  On April 27-28, 2015, Eletrobras' ADSs increased in price by about 5.9% to close at $2.67 per ADS on April 28, 2015.

51.     On April 30, 2015 before the markets opened for trading, Eletrobras filed a notice on Form NT 20-F with the SEC disclosing that the Company would be unable to file its Annual Report on Form 20-F for the year ended December 31, 2014 by April 30, 2015, the prescribed date for the Form 20-F filing.  The Company gave two reasons for the delay.  First, Eletrobras disclosed that the auditor of a significant affiliate of Eletrobras, Energia Sustentável do Brasil Participações S.A. (the affiliate operating Jirau), had informed the Company that it did not consider itself independent under the relevant U.S. independence rules and that a new auditor had been appointed to audit the financial statements of Jirau for purposes of applying equity method accounting. Second, as a result of press reports in relation to Operation Car Wash that the consortium of companies bidding for the mechanical assembly of the Angra 3 power plant allegedly made illegal payments to the CEO of Eletrobras' wholly owned subsidiary, Eletronuclear, the CEO of Eletronuclear (Pinheiro da Silva) requested a leave of absence.  A separate SEC filing also disclosed that although the Company's internal investigation had not yet concluded, the Board of Directors had approved the engagement of a "specialized and independent entity to conduct an investigation to ensure transparency and independence."  On April 30, 2015, Eletrobras' ADSs declined by 8.24% to close at $2.45 per ADS.

52.     Subsequently, on June 10, 2015 Eletrobras disclosed in an SEC filing that it had hired the international law firm of Hogans Lovell to evaluate whether there are irregularities that

violate the U.S. Foreign corrupt Practices Act, the Brazilian anti-corruption Law No. 12,846/2013 and the Code of Ethics of Eletrobras Companies with respect to Eletrobras' relationship with the companies mentioned in Operation Car Wash.

53.     Then, on June 25, 2015, the end of the Class Period, Bloomberg reported that certain asset sales planned by Eletrobras were stalled in the midst of the bribery investigations. On June 25, 2015, Eletrobras' ADSs declined by 5% to close at $1.87 per ADS.

54.     Further developments have continued to emerge since the end of the Class Period demonstrating Eletrobras' payment of bribes and political kickbacks in connection with the award of the Angra 3, Belo Monte and Jirau construction projects.  For example, in a Form 6-K SEC filing dated July 13, 2015 the Company reported that it had received a letter from the CVM "requesting clarification regarding news published by the newspaper 'Folha de São Paulo', entitled 'Building Contractor accuses officer of Eletrobras'…."  According to Eletrobras' translation, the content of the article is as follows:

> The businessman Ricardo Pessoa told prosecutors of Operation Lavo Jato that an officer of Eletrobras, Valter Luiz Cardeal suggested that he give to PT part of what he expected to win in a state company contract to build the nuclear power plant Angra 3, according to the edition of the "Veja" magazine that began circulating on Saturday [July 11, 2015]. [...]

> The estimated cost for the construction of Angra 3 is R$ 3.2 billion. According to the report of Mr. Pessoa obtained by the magazine, Eletrobras asked for a 10% discount in the amount charged by the contractor consortium, which accepted a 6% rebate.  Closed the contract, Cardeal tell the contractors that the difference should be transferred to the PT in the form of election donations.

> According to the report reproduced by the magazine, Pessoa said that the suggestion was made at the end of last year.  The contractor said that soon thereafter was approached by the then treasurer of the PT, John Vaccari, currently arrested in Curitiba, to make payment of the election donations to PT.

> One of the former executives of Camargo Corrêa who has cooperated with the investigations in February, Dalton Avancini, told prosecutors of the Lava Jato that he paid bribes in 2011 to the former Minister of Mines and Energy, Senator Edison Lobão (PMDB-

MA) to obtain facilities in the construction of the hydroelectric plant of Belo Monte and works of Angra 3.

55.     However, in the July 13, 2015 Form 6-K filing, the Company claimed to have no knowledge about the news transcribed other than through the news itself, thereby effectively denying the allegations.

56.     Additionally, on July 28, 2015, Pinheiro da Silva, the CEO of Eletronuclear who reportedly received payments in connection with the construction of Angra 3 and had taken a leave of absence at the end of April 2015, was arrested.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

57.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Eletrobras, their control over, and/or receipt and/or modification of Eletrobras' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Eletrobras, participated in the fraudulent scheme alleged herein.

58.     Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.  Defendants had the motive and opportunity

to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of Eletrobras, issued statements and press releases on behalf of Eletrobras and had the opportunity to commit the fraud alleged herein.

## IX.   LOSS CAUSATION/ECONOMIC LOSS

59.   During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Eletrobras' securities and operated as a fraud or deceit on Class Period purchasers of Eletrobras' securities by misrepresenting the Company's operating conditions, commitment to ethics and corporate responsibility, and financial condition.

60.   As a result, the market for the Company's securities promptly digested current information with respect to Eletrobras from all publicly available sources and reflected such information in the price of the Company's securities.   Accordingly, Plaintiff and the Class purchased Eletrobras' securities at artificially inflated prices. Once the truth began to emerge and Eletrobras' prior false statements, misrepresentations and fraudulent conduct were disclosed to the market, the artificial inflation in the price of Eletrobras' securities was removed, causing economic loss to Plaintiff and the other members of the Class.

## X.   FRAUD-ON-THE-MARKET DOCTRINE

61.   At all relevant times, the market for Eletrobras' securities was an efficient market for the following reasons, among others:

(a)   The Company's securities were actively traded in a highly efficient market;

(b)   As a regulated issuer, the Company filed periodic public reports with the SEC;

(c)   The Company was covered regularly by securities analysts; and

(d)     The Company regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

62.     As a result, the market for the Company's securities promptly digested current information with respect to Eletrobras from all publicly available sources and reflected such information in the price of the Company's securities.  Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the securities of Eletrobras at artificially inflated prices and a presumption of reliance applies.

## XI.     NO SAFE HARBOR

63.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Eletrobras who knew that those statements were false when made.

## FIRST CLAIM FOR RELIEF

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against the Defendants**

64.     Plaintiff repeats, incorporates and re-alleges ¶¶ 1 - 63 by reference.

65.     During the Class Period, the defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.     The defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

- Employed devices, schemes and artifices to defraud;

- Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

- Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Eletrobras securities during the Class Period.

67.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Eletrobras' publicly traded securities.  Plaintiff and the Class would not have purchased Eletrobras securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the defendants' misleading statements.

27

68.     As a direct and proximate result of the defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Eletrobras securities during the Class Period.

## SECOND CLAIM FOR RELIEF

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

69.     Plaintiff repeats, incorporates and re-alleges ¶¶ 1 - 63 by reference.

70.     The Individual Defendants acted as controlling persons of Eletrobras within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

72.     As set forth above, Eletrobras and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

positions, each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Eletrobras' and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding rescission and/or damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: August 15, 2015                    **KAPLAN FOX & KILSHEIMER LLP**

By:  */s/ Frederic S. Fox*
        Frederic S. Fox
        Donald R. Hall
        Hae Sung Nam
        Pamela A. Mayer
        850 Third Avenue, 14th Floor
        New York, New York 10022
        Tel: (212) 687-1980
        Fax: (212) 687-7714
        Email:  ffox@kaplanfox.com
                dhall@kaplanfox.com
                hnam@kaplanfox.com
                pmayer@kaplanfox.com

*Counsel for Plaintiff City of Providence, Rhode Island*